UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **SANTIAGO GONZALES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-04-62** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM & OPINION**

Pending before the Court are Plaintiff Santiago Gonzales' ("Gonzales") Motion for Summary

Judgment (Dkt. #5) and Defendant Jo Anne B. Barnhart, the Commissioner of the Social Security

Administration's ("Commissioner"), Motion for Summary Judgment (Dkt. #9). After consideration

of the motions, the entire record, and the applicable law, the Court is of the opinion that Gonzales'

motion should be DENIED and the Commissioner's motion should be GRANTED.

**Factual and Procedural Background**

Gonzales filed this action pursuant to 42 U.S.C. § 405(g) and § 1383(c) for judicial review

of an unfavorable decision by the Commissioner regarding his application for Social Security

Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") under the Social Security

Act ("the Act").

Gonzales filed an application for SSDI and SSI benefits on February 12, 2002, alleging

disability as of December 17, 2001.[1]  On his Disability Report, he alleged disability due to heart

---

[1] Transcript of the Administrative Proceedings ("Tr.") 66.

problems.[2]  Gonzales was 51 years old on the date of his hearing before the Administrative Law Judge ("ALJ").  He has an 11th grade education and completed the requirements for his GED in 2001.[3]  Prior to the onset date of his alleged disability, Gonzales was employed as a roughneck in the oil industry–a heavy, semi-skilled position.[4]  The job of roughneck has no transferable skills, according to the vocational expert.[5]

After his application was denied at the consideration and reconsideration levels, Gonzales requested a hearing, which was held on October 20, 2003 before ALJ Justilian Martin, Jr.[6]  At the hearing, Gonzales was represented by counsel.  Gonzales testified at the hearing, as well as a medical expert, Dr. William Hicks ("ME") and a vocational expert, Don Marth ("VE").

When questioned by the ALJ, Gonzales testified that he was not currently employed at the time of the hearing,[7] and had not been employed since his heart attack in December 2001.[8]  The last time he saw a physician was in January 2003.  He was not taking his medication because he could not afford it.[9]  However, Gonzales did still use Nitrogylcerine tablets and cream; the cream relieves

---

[2] *Id.*

[3] *Id.* at 242.

[4] *Id.* at 248.

[5] *Id.* at 257.

[6]  *Id.* at 44.  The transcript of the hearing indicates that the hearing was held on October 28, 2003.  *Id.* at 241.  The date however is not relevant to the Court's finding.

[7] *Id.* at 245.

[8] *Id.*

[9] *Id.* at 246–47.

his chest pain within 15-20 seconds.[10]  He lives with his brother, and during the day he walks in the

yard for exercise, watches television, and relaxes.[11]  If he walks more than a block and half to two

blocks he gets chest pain and has to sit down or stop walking before the pain will go away, usually

within 3-4 minutes.[12]  He testified any time he does anything strenuous or if his heart rate increases

he experiences chest pain until he relaxes.[13]  Responding to questioning from his attorney, Gonzales

testified he usually suffers from chest pain approximately twice a week.[14]  He further conceded that

if he were taking the medications prescribed to him to stabilize his heart rate, the chest pains would

not occur as frequently, if at all.[15]

Next, Dr. Hicks, the ME, testified regarding the claimant's impairments and the severity of

those impairments.  The ME recounted claimant's medical history.  Claimant has ischemia heart

disease with a history of triple bypass surgery in 1990.[16]  In 1996, he had a normal catheterization.[17]

In November 2001, Gonzales performed an exercise tolerance test ("ETT") for almost 10 minutes.

He went to stage IV and achieved 87 percent heart rate and 11 METS.[18]  Although he experienced

---

[10]  *Id.* at 248.

[11]  *Id.* at 246.

[12]  *Id.* at 246–47.

[13]  *Id.* at 247, 250.

[14]  *Id.* at 250.

[15]  *Id.*

[16]  *Id.* at 252.

[17]  *Id.*

[18]  *Id.* at 184.

no chest pain, the ME believed the test was positive.[19]   Gonzales reported chest pain in mid-December, and while incarcerated, Gonzales suffered from a heart attack on December 17, 2001. He was diagnosed with a non-Q myocardial infarction, coronary artery disease and hypercholesterolemia, although he remained stable during the hospital stay.[20] A heart catheterization performed during the December hospital stay revealed 100 percent occlusion of his native vessels and the grafts were mildly patent.[21]   His ejection fraction at the time of the infarction was 15 percent.[22]   His ejection fraction increased to 29 percent.[23]   He was discharged as asymptomatic without congestive heart failure.[24]

In March 2002, claimant again was admitted to the hospital for chest pain.[25]   His cardiac enzymes were elevated, and he had atrial fibrillation.[26]  He was treated aggressively with intraveous aggrastat and heparin.  He was discharged as stable with instructions to follow-up at the cardiac clinic.[27]  An ETT was performed on May 1, 2002, testing positive for ischemic changes and chest

---

[19] *Id.* at 252.

[20] *Id.* at 188.

[21] *Id.* at 187.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at 141–42.

[26] *Id.*

[27] *Id.* at 142.

pain.[28]   Gonzales exercised 6:43 minutes and attained 8 METS and a 75 percent heart rate.[29]

Thereafter, his angina was stable, but he was told he would need a transplant in the near future.[30]

On July 3, 2002, his ejection fraction was at 40 percent, a positive increase.[31]   On September 24,

2002, his ejection fraction remained 40–44% with occasional chest pain.[32]   The medical records also

indicated that he was a functional class III.[33]   During his last visit to a doctor in January 2003,

claimant showed no signs of shortness of breath, dizziness, or edema. The doctor noted he could

walk 1000 yards and get fatigued and some pressure pain, but any pain improved with rest.

Additional notes indicated no angina with activities of daily living, no congestive heart failure, and

no change in functional class.[34] Dr. Hicks testified that class III is basically sedentary work

involving chest pain with less than ordinary activity.[35]   However, a notation on the last medical

report stated Gonzales was a class II, or capable of light work.[36]

Finally, Don Marth, the VE, testified that Gonzales' previous employment as a roughneck

would be characterized as heavy activity of a semi-skilled nature, which included a very specific

---

[28] *Id.* at 119.

[29]  *Id.*

[30] *Id.*

[31]  *Id.* at 254.

[32]  *Id.* at 255.

[33]  *Id.*

[34]  *Id.* at 255–56.

[35]  *Id.*

[36] *Id.*

skill set.[37]  Marth indicated this skill set would not be transferrable.[38]

After the completion of the hearing, the ALJ issued his decision denying benefits on February 24, 2004.[39]  The Appeals Council subsequently declined to review the ALJ's decision on May 13, 2004.[40]  The ALJ's decision thus became the Social Security Administration's final decision.  Gonzales then brought this timely action for review of the Commissioner's final decision.

## Standard of Review and Applicable Law

The Court's review of the Commissioner's final decision to deny disability benefits is limited to two issues: (1) whether substantial record evidence supports the decision, and (2) whether proper legal standards were used to evaluate the evidence.  *See Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) (citing *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000)); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999) (quoting *McQueen v. Apfel*, 168 F.3d 152, 157 n.2 (5th Cir. 1999)).

If the findings of fact contained in the Commissioner's decision are supported by substantial evidence, they are conclusive and this Court must affirm.  The widely accepted definition of "substantial evidence" is more than a mere scintilla, but less than a preponderance.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Carey*, 230 F.3d at 135.

---

[37]  *Id.* at 256–57.

[38]  *Id.*

[39]  *Id.* at 23.

[40]  *Id.* at 4.

In applying this standard, the court is to review the entire record, but it may not reweigh the evidence, decide the issues *de novo*, or substitute the court's judgment for the Commissioner's. *Brown*, 192 F.3d at 496.  Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The legal standard for determining disability under the Act is whether the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that the Commissioner should evaluate disability claims according to the following sequential five-step process:

(1)     a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are;

(2)     a claimant will not be found to be disabled unless he has a "severe impairment;"

(3)     a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors;

(4)     a claimant who is capable of performing work he has done in the past must be found "not disabled;" and

(5)     if the claimant is unable to perform his previous work as a result of his impairment, then factors such as age, education, past work experience, and residual functional capacity must be considered to determine whether he can do other work.

20 C.F.R. § 404.1520(b)-(f)*; see also Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

To be entitled to benefits, a claimant bears the burden of proving that he is unable to engage

7

in substantial gainful activity within the meaning of the Act.  *See Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991) (citing *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985)).  The claimant must show that he suffers from a mental or physical impairment that not only renders him unable to perform his previous work, but, given his age, education, and work experience, prevents him from engaging in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  *Johnson v. Harris*, 612 F.2d 993, 997 (5th Cir. 1980) (quoting *Rhynes v. Califano*, 586 F.2d 388, 389-90 (5th Cir. 1978)).  However, if the claimant can show that he can no longer perform his previous job, the burden shifts to the Commissioner to show that there exists some other form of substantial gainful employment that the claimant can perform, consistent with his residual functional capacity, age, education, and work experience.  *Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980); *Johnson*, 612 F.2d at 997.  By judicial practice, this translates into the claimant bearing the burden of proof on the first four of the above steps, and the Commissioner bearing the burden on the fifth.  *See Brown*, 192 F.3d at 498; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)).  The analysis stops at any point in the five step process upon a finding that the claimant is or is not disabled.  *Greenspan*, 38 F.3d at 236.

The ALJ found that the claimant has coronary artery disease and that his impairment is severe within the meaning of the Regulations but not severe enough to meet or equal one of the listed impairments in Appendix 1, Subpart P, of Regulations No. 4.[41]  The ALJ determined that although the claimant would not be able to return to his prior work, "his ability to perform basic

---

[41] *Id.* at 19.

work activities was not [] limited" and "his condition allowed for the performance of other less demanding work."[42]   The ALJ rejected claimant's subjective complaints that his pain was of such severity as to be disabling under the Regulations, but rather determined claimant's condition was stable.[43]   Arriving at the fifth step, the ALJ determined that in light of the claimant's age, education, and vocational experience, the "claimant retains the residual functional capacity to perform a full range of light work."[44] Thus, relying on the Medical-Vocational Guidelines, the ALJ determined claimant was not disabled.

Plaintiff cites three alleged errors for the Court's review.  The Court will address each in turn.

**A.**      **No Hypothetical Posed to Vocational Expert**

First, Plaintiff contends the ALJ erred in relying solely on the Medical-Vocational Guidelines ("Guidelines") to determine claimant was not disabled.  20 C.F.R. Pt. 404, Subpart P, App. 2.  Plaintiff asserts the Commissioner did not meet its burden, under the fifth step, because the ALJ failed to pose a hypothetical question to the VE to determine work adjustment and availability of jobs in the national economy.  The ALJ only questioned the VE about the Plaintiff's past work experience, and thus could not have determined if other work was available that Plaintiff could perform.

In determining whether the claimant can do any other work, the ALJ considers the claimant's residual functional capacity, together with age, education, and work experience, according to the

---

[42]  *Id.* at 20.

[43]  *Id.*

[44]  *Id.* at 20–22.

Guidelines.  20 C.F.R. § 404.1520(f).  If the Plaintiff is capable of performing some level of work, then the ALJ must consider (1) whether the severe impairments are exertional, nonexertional or a combination of both, and (2) whether the Plaintiff can perform a full range of the indicated work level.  *Bolton v. Callahan*, 984 F. Supp. 510, 513 (N.D. Tex. 1997).  When the claimant suffers from only exertional impairments or nonexertional impairments that do not significantly affect the claimant's residual functional capacity, then the ALJ may rely exclusively on the Guidelines to determine whether there is other work in the economy that the claimant can perform.  *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); *see also* 20 C.F.R. § 404.1569a(b) ("When your impairment(s) and related symptoms only impose exertional limitations and your specific vocation profile is listed in a rule contained in Appendix 2 of this subpart, we will directly apply that rule to decide whether you are disabled.").  If the ALJ finds that the Plaintiff can perform a full range of some level of work in the economy, then the ALJ may take administrative notice that there are jobs in the national economy which can be performed by the Plaintiff.  *Ferguson v. Schweiker*, 641 F.2d 243, 246 (5th Cir. 1981).  Otherwise the ALJ must consult a vocational expert to establish that such jobs exist.  *Fraga*, 810 F.2d at 1304.

The ALJ found that Gonzales suffered from an exertional impairment only and determined that Gonzales retained the residual functional capacity to perform a full range of light work.  Based on his age,[45] his high school equivalent education and his lack of transferrable skills, the ALJ ruled no disability based on Guideline Rules 202.10, 202.12, 202.14.  Purely "exertional limitations" are those "limitations and restrictions imposed by your impairment(s) and related symptoms, such as

---

[45] *See* 20 C.F.R. § 404.1563(d) (defining "person closely approaching advanced age" as those persons between the ages of 50-54).

pain, [which] affect only your ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b).  In the Daily Activity Questionnaire completed by Gonzales he indicated that "walking long distances or doing any physical activity" cause the chest pain associated with his heart condition.[46]  Also, by his own testimony, Gonzales conceded that his heart condition only affects his ability to do physical activity.[47]  Thus, substantial evidence supports the ALJ's finding that Gonzales' heart condition is solely an exertional impairment.

Further, the Social Security Regulations describe "light work" as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

*Id.* § 404.1567(b). The medical records as well as the testimony of Gonzales himself support the ALJ's finding that he is capable of performing a full range of light work.  First, Gonzales testified that walking over two blocks or engaging in physical activity will cause his heart rate to increase and in turn cause chest pain.  However, the pain subsides when he sits, stands still or relaxes, allowing his heart rate to decrease.  Also, Gonzales testified that the pain is controllable with use of his Nitroglycerine pills or cream.  Applying the cream will alleviate the pain within 15-20 seconds.  The chest pain only occurs 2-3 times per week.  In his Daily Activity Questionnaire, Gonzales also stated his physical condition does not affect his ability to sit, stand, use his arms or

---

[46] Tr. 87.

[47] *Id.* at 246.

legs, walk short distances, or lift and carry "heavy" things.[48]  On a follow-up questionnaire, he more specifically admitted that his physical problems would only limit his lifting of anything over 20 pounds.[49]  Additionally, a state agency medical consultant conducted a residual functional capacity assessment, finding that Gonzales was capable of performing a full range of light work, including occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, standing, walking and sitting for 6 hours of an 8 hour workday with unlimited pushing and pulling capabilities.[50]  The state agency medical consultant agreed that the claimant's impairment was not as limiting as he indicated, and although he could not perform his prior work, he would be able to perform less demanding work.  Finally, the most recent medical record reviewed in this case noted that Plaintiff's medical condition was stable, no angina occurred with activities of daily living, and Plaintiff was at a functional class II, all consistent with light work capabilities.  Thus, as Plaintiff's impairments are solely exertional and the evidence supports his ability to perform a full range of light work, the ALJ's reliance on the Guidelines was appropriate in this case.

## B.      No Disability Under Listing of Impairments

Next, Plaintiff argues the ALJ erred by not finding that his impairments met or equaled the requirements of § 4.04(C), the listing for ischemic heart disease with coronary artery disease. Plaintiff asserts that he meets or equals medical listing 4.04(C) based on the results of his angiography, finding 100% stenosis of a non-bypassed left coronary artery and marked limitation in physical activity.  Defendant avers that Plaintiff's reliance on the results of the angiography is

---

[48] *Id.* at 88.

[49] *Id.* at 97.

[50] *Id.* at 103.

misplaced. The Court agrees.

Section 4.04 requires a claimant to make the following showing:

Ischemic heart disease, with symptoms due to myocardial ischemia, as described in 4.00E3-4.00E7, while on a regimen of prescribed treatment (see 4.00B3 if there is no regimen of prescribed treatment), with one of the following:

A. Sign-or symptom-limited exercise tolerance test demonstrating at least one of the following manifestations at a workload equivalent to *5 METs or less*:

1. Horizontal or downsloping depression, in the absence of digitalis glycoside treatment or hypokalemia, of the ST segment of at least -0.10 millivolts (-1.0 mm) in at least 3 consecutive complexes that are on a level baseline in any lead other than aVR, and depression of at least -0.10 millivolts lasting for at least 1 minute of recovery; or

2. At least 0.1 millivolt (1 mm) ST elevation above resting baseline in non-infarct leads during both exercise and 1 or more minutes of recovery; or

3. Decrease of 10 mm Hg or more in systolic pressure below the baseline blood pressure or the preceding systolic pressure measured during exercise (see 4.00E9e) due to left ventricular dysfunction, despite an increase in workload; or

4. Documented ischemia at an exercise level equivalent to 5 METs or less on appropriate medically acceptable imaging, such as radionuclide perfusion scans or stress echocardiography.

OR
. . .

C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, *and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2*:

1. Angiographic evidence showing:
a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or
b. 70 percent or more narrowing of another nonbypassed coronary artery; or
c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or

13

e. 70 percent or more narrowing of a bypass graft vessel; *and*

2. *Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.*

20 C.F.R. Part 404, Subpart P, App. 1, § 4.04(C) (emphasis added) ("Listings").  The relevant language in § 4.04(C) indicates that angiography results should only be relied upon in the absence of a timely ETT.  In other words, angiography results may only support a finding of disability under § 4.04(C) when "an evaluating program physician . . . has concluded that performance of exercise testing would present a significant risk to the individual."  Here, Plaintiff's doctors were able to perform several ETTs, the most recent being in May 2002.  In order to meet the Listing based on an ETT, a claimant must have a sign or symptom-limited exercise test demonstrating particular and significant EKG changes at a workload equivalent to 5 METS or less.  Plaintiff's test revealed he exercised 8 METS before the test was positive.  Based on these results Plaintiff does not meet the Listing.  Further, Dr. Hicks unequivocally testified that Plaintiff did not meet or equal the listing requirements.[51]  *See* 20 C.F.R. § 404.1527(f)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart.").

Moreover, even if the ALJ were to consider the angiography results, Plaintiff still would not meet or equal the Listing.  Section 4.04(C) requires specific angiographic evidence *and* "very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living" to demonstrate coronary artery disease.  The medical records and testimony of Gonzales

---

[51] *Id* at 241–42.

demonstrate that Plaintiff is able to perform activities of daily living without serious limitation. Thus, the ALJ did not err in finding that Plaintiff did not meet or equal Listing § 4.04(C).

**C.      Reliance on Wrong Medical-Vocational Guideline**

Finally, Plaintiff alleges the ALJ erred by not finding the claimant was disabled under Rule 201.14 of the Guidelines, as he is closely approaching advanced age with no transferable skills and is limited to sedentary work.  As discussed more fully in section A *supra*, Plaintiff is capable of performing a full range of light work and therefore would not qualify under Rule 201.14, which applies only to those limited to performing sedentary work.  Therefore, the ALJ did not err when he found no disability under Rules 202.10, 202.12, and 202.14.

Conclusion

For the foregoing reasons, Gonzales' Motion for Summary Judgment (Dkt. #5) is DENIED and the Commissioner's Motion for Summary Judgment (Dkt. #9) is GRANTED.  The Court shall enter a final judgment on even date herewith.

**SIGNED** on this 28th day of February, 2007.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE